J-A04044-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO I.B., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.J., FATHER | : : : : : : | |
| | : | No. 1407 MDA 2022 |

Appeal from the Decree Dated September 16, 2022
In the Court of Common Pleas of Lycoming County Orphans' Court at
No(s):  2022-6798

BEFORE:  STABILE, J., DUBOW, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:               **FILED:  MARCH 3, 2023**

J.J. (Father) appeals from the decree entered in the Lycoming County Orphans' Court on September 16, 2022, involuntarily terminating Father's parental rights to his son, I.B. (Child), born in July 2014, and changing Child's permanency goal to adoption.[1]  On appeal, Appellant argues there was insufficient evidence to support termination, and that the court relied solely on his "extremely limited income."  In addition, counsel for Father (Counsel), has filed an application to withdraw and an accompanying brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v.**

---

[1] A.B. (Mother), the mother of Child, signed a Consent to Adoption on August 25, 2022.  Father and Mother were not married at the time of Child's birth and did not appear to be together at the time of the termination hearing.  Mother is not a party to this appeal.

*Santiago*, 978 A.2d 349 (Pa. 2009). After review, we affirm the termination decree, and grant the application to withdraw.

Child was placed in the emergency custody of Lycoming County Children and Youth Services (Agency) on January 13, 2021, after Father was not present to pick up Child from the school bus. N.T. 9/15/22, at 43. Child's school, Agency caseworkers, and "crisis workers" attempted to contact Father several times. *Id.* When he did not respond, the Agency asked Child's neighbors if they could provide short term care for Child but were unsuccessful. *Id.* The Agency then took emergency custody of Child. *Id.* Father did not contact the Agency until approximately 11 hours later, at "about 2:00 a.m.[,]" on January 14th, but only to inquire as to why he had "so many missed calls from [the Agency]," and did not ask about Child or "seem to process the fact that [Child] wasn't home with him." *Id.* at 44. A Shelter Care hearing was held on January 15th,

> at which time the [c]ourt found that allowing . . . Child to remain in [Appellant's] home would be contrary to [Child's] welfare. Legal and physical custody of . . . Child was to remain with the Agency and . . . Child was to remain in foster care.

Orphans' Ct. Op. 9/19/22, at 2.[2]

_____

[2] The court filed an opinion related to this appeal on October 4, 2022, in which it adopted its September 19th opinion supporting the termination decree. Orphan's Ct. Op. 10/4/22, at 2 (unpaginated). We rely on the court's September 19th opinion in our analysis.

The orphans' court held a dependency hearing and several permanency hearings between January 2021 and June 2022. The court summarized the hearings as follows:

A Dependency Hearing was held on January 22, 2021, at which time the [c]ourt found that . . . Child was without proper care or control, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. The [c]ourt ordered that legal and physical custody remain with the Agency and that . . . Child remain in foster care. The [c]ourt noted that . . . Child had been absent from school on [36] days, with [21] of those days being unexcused, and that Father had previously been referred for Outreach Services by Bradford County [Children and Youth Services], but those were discontinued due to Father's noncompliance.

A permanency review hearing was held on May 14, 2021. Father did not attend. The [c]ourt noted that Father had only minimal compliance with the permanency plan, in that he attended [12] out of [26] visits during the review period. He attended an intake at Crossroads but did not attend any sessions and was discharged on April 6, 2021, due to non-attendance. Father was not compliant with Outreach services and they were subsequently closed[, and] Father relocated to Bradford County. Father was found to have made no progress towards alleviating the circumstances which necessitated the original placement. Following the hearing, the [c]ourt reaffirmed dependency and . . . Child remained in the legal and physical custody of the Agency with continued placement in his foster care home.

A permanency review hearing was held on August 16, 2021. Father did not attend. The [c]ourt found that Father had no compliance with the permanency plan, in that he attended only [8] out of [19] visits during the review period. The Agency received a report on June 7, 2021,[3] that Father had overdosed and was receiving in patient services at Family Recovery

_____

[3] The termination petition states the Agency received this report on July 7, 2021. Petition for Involuntary Termination, 4/13/22, at 7. This discrepancy does not impact our review.

- 3 -

Solutions, but Father did not provide any documentation to support this. Father did not participate in any other drug or alcohol treatment during this review period, nor did he participate in any parenting programs. The [c]ourt further found that Father had made no progress towards alleviating the circumstances which necessitated the original placement and noted that Father needed to take steps to seek help for himself before he could be considered a resource for the Child. Following the hearing, the Court reaffirmed dependency and the Child remained in the legal and physical custody of the Agency with continued placement in his foster care home.

A permanency review hearing was held on November 29, 2021. Father attended by telephone. The [c]ourt found that Father had no[t] compli[ed] with the permanency plan, in that he attended no visits during the review period, participated in no drug or alcohol programs during the review period, and had not participated in any programs for parenting during the review period. Father's communication with the Agency was very sporadic. For these reasons, the Court also found that Father had made no progress towards alleviating the circumstances which necessitated the original placement. The Agency requested that Father's visits be reduced to the statutory minimum of one time every other week for one hour. The [c]ourt granted this request, with the caveat that if Father attended regularly his visits may be increased. Following the hearing, the [c]ourt reaffirmed dependency and . . . Child remained in the legal and physical custody of the Agency with continued placement in his foster care home.

A permanency review hearing was held on March 9, 2022. Father attended in person. During this review period[,] Child's placement was modified to the [home of Carol Swartz, a resource parent], where he has remained since that time. . . . The [c]ourt found that Father had minimal compliance with the permanency plan. He attended [four] out of [eight] visits and had [four] no[-]shows. He was receiving no drug or alcohol services, and had not participated in any services for parenting. Father was not involved with Outreach services. For these reasons, the [c]ourt found that Father had made no progress towards alleviating the circumstances which necessitated the original placement. Following the hearing, the [c]ourt reaffirmed dependency and . . . Child remained in the legal and physical custody of the Agency with continued placement in his foster care home. The [c]ourt directed the Agency to make a referral to Outreach

services to Father, and to offer to provide those services at the Agency on the same day as Father's scheduled visits with the Child.

A permanency review hearing was held on June 24, 2022. Father attended in person. The [c]ourt found that Father had minimal compliance with the permanency plan, in that he attended [six] out of [seven] visits. However, he was still not receiving any drug or alcohol counseling and he only attended two Outreach appointments. He did not participate in any of . . . Child's medication checks, which occurred virtually. Father requested that his visits be increased to one time per week, which the [c]ourt granted as he had demonstrated good attendance during this review period and the visits were going well. The [c]ourt found that Father had made minimal progress towards alleviating the circumstances which necessitated the original placement, as he reported having a trailer to live in but that he had quit his job and his sole source of income was [Social Security Disability]. Following the hearing, the [c]ourt reaffirmed dependency and . . . Child remained in the legal and physical custody of the Agency with continued placement in his foster care home.

Orphans' Ct. Op. at 2-5.

Meanwhile, on April 13, 2022, the Agency filed a petition for involuntary termination of parental rights as to both Father and Mother pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). As mentioned above, on August 25, 2022, Mother signed a Consent to Adoption. A hearing regarding the termination petition was held on September 15, 2022. Despite being properly served notice of the hearing, Father failed to appear but was represented by Jessica Feese, Esquire. Orphans' Ct. Op. at 1. Mother participated by phone and was represented by Trisha Hoover Jasper, Esquire. John Pietrovito,

Esquire, counsel for the Agency, and Angela Lovecchio, Esquire, Child's guardian *ad litem* (GAL/Legal Counsel),[4] were also present at the hearing. ***Id.***

The court first addressed Mother, who stipulated to the Agency's exhibits and all the allegations in the termination petition. N.T. at 5-9. She also admitted that if the Agency had presented its full case against her, it would have established by clear and convincing evidence grounds for termination. ***Id.*** at 10.

The Agency then presented the testimony of Lycoming County Children and Youth Outreach Program (Outreach) caseworker David Ryder, who stated that during his time working with Father, Father was "difficult . . . or impossible almost" to coordinate meetings with, "constantly" had issues with phone contact, and was never able to work on identified goals. N.T. at 12-13. When Caseworker Ryder inquired about Father's visits with Child, Father told

---

[4] During involuntary termination proceedings where one or both parents are contesting termination, the orphans' court must appoint legal counsel to the subject child to represent their legal interests. 23 Pa.C.S. § 2313(a). When a court appoints one attorney as both GAL and legal counsel for the child, this Court conducts a "*sua sponte* review to evaluate . . . whether the orphans' court determined that the child's best interests and legal interests did not conflict." ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1236 (Pa. Super. 2020) (this Court must conduct independent review of whether orphans' court appointed counsel to represent the child's legal interests, and when that same counsel is also appointed as GAL, whether the orphans' court determined that the child's best interests and legal interests do not conflict). Appellate review "does not involve second-guessing whether GAL/Counsel in fact had a conflict . . . but solely whether the orphans' court made the determination in the first instance." ***Id.*** On June 16, 2022, the orphans' court issued an order finding no conflict of interest with Attorney Lovecchio acting as both GAL and Child's Legal Counsel. Order, 6/16/22.

him they were "going good" but "it was costing . . . a lot of money for transportation" because Appellant recently wrecked his car and did not have the money for repairs. *Id.* at 14. Caseworker Ryder testified that Father relocated to Bradford County to live with an aunt. *Id.* at 14. The caseworker still offered to "work with [Father] on parenting" during his visitation with Child, but Father declined. *Id.* at 14-15. Caseworker Ryder also provided Father information to "pursue parenting" in Bradford County and stopped his services with Father on April 13, 2021. *Id.* at 15.

Barbie Barnes, another Outreach Caseworker, then testified that Father was referred back to Outreach services on March 31, 2022. N.T. at 17. She stated that her experience working with Father was "identical in nature" to that of Caseworker Ryder, explaining that Father met with her only "three times successfully face-to-face[,]" "willfully avoided" her, and made "no progress" while working with her. *Id.* at 18-19. On August 10, 2022, Father sent Caseworker Barnes a "lengthy text message . . . stating he wanted to close [Outreach] services[.]" *Id.* at 19. Caseworker Barnes recommended that Father continue working with Outreach and sent him a letter stating if he did not contact Outreach by August 25th, the program would close services. *Id.* at 20-21. The letter was not returned to Outreach as undelivered and Father did not respond. *Id.* at 21.

Heather Wood, a specialized services supervisor for the Agency, testified that when Father attended the supervised visits, he was "engaged" and played with Child, would "usually bring[ ] something for [Child] to do[,]" and brought

"dinner or a snack[.]" N.T. at 33. Child "enjoy[ed]" the visits at first, however, more recently, Child would express that he did not want to attend, and on more than one occasion communicated that he "want[ed] to go home" — referring to his foster home. *Id.* at 29, 33.

Carol Swartz, Child's resource parent, testified that at the time of the hearing, Child had resided with her for six months. N.T. at 34. She stated she cares for Child by ensuring his medical and mental health needs are taken care of, doing activities with him on weekends, and making sure he is bathed, clothed, and fed. N.T. at 34-38. Since residing with Swartz, Child's behavior, attendance, and performance in school have improved. *Id.* at 38-39. Swartz stated that Father had the ability to call Child at her home and would do so for "about [f]ifteen minutes" once a week, but Child "never wanted to talk." *Id.* at 39-40. Lastly, she said that if the court terminated Father and Mother's parental rights, she was ready, willing, and able to adopt Child. *Id.* at 40.

Lastly, Ryan Snyder, a supervisor at the Agency, testified that his office became involved with Child before January 2021, after: (1) receiving "multiple reports of [Child] being outside unsupervised[;]" (2) learning Father was not administering proper medical care; (3) learning of Father's issues with substance abuse; and (4) concerns arose regarding Child's attendance at school. N.T. at 42. He also stated that Appellant has a criminal conviction from January 29, 2018, for endangering the welfare of a child and a "report" from May 2017 for "creating a reasonable likelihood of bodily injury." *Id.* at 51. In both instances, Child was the victim. *Id.* He testified that the Agency

recommended to terminate Father's parental rights and that this course of action "would best serve the needs and welfare" of Child. *Id.* at 54.

At the conclusion of the hearing, the court found the Agency "clearly established the grounds to terminate [Father's] parental rights" and that it was "in the best interest of [Child] to do so." N.T. at 56. The next day, the court entered a decree terminating Father's rights and stating Child may be subject to adoption proceedings without further notice to Father. Decree, 9/16/22. Counsel for Father timely filed a notice of appeal and a contemporaneous concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2) and (b). In the Rule 1925(b) statement, Counsel also notified the court she intended to file an *Anders* brief. Counsel filed her application to withdraw and an accompanying brief on November 17, 2022.[5]

We begin by reviewing Counsel's application to withdraw and *Anders* brief. *See In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014) ("When counsel files an *Anders* brief, this Court may not review the merits without first addressing counsel's request to withdraw.") (citation); *see also In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992) (extending the *Anders* procedure to appeals from

---

[5] In its brief, the Agency adopted the orphans' court September 19, 2022, opinion as part of its argument. Appellee's Brief at 4. GAL/Legal Counsel for Child sent a letter to this Court on December 12, 2022, stating that she was not going to file a brief and was relying on the orphans' court's September 19th opinion. GAL/Legal Counsel Letter, 12/12/22.

involuntary termination decrees). To withdraw pursuant to *Anders*, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted). With respect to the third *Anders* requirement, this Court has held counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, the Pennsylvania Supreme Court has directed that *Anders* briefs must:

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

"Once counsel has satisfied the above requirements, it is then this Court's duty to conduct [our] own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *In re X.J.*, 105 A.3d at 4 (citation omitted). Here, Counsel has

filed an ***Anders*** brief and application to withdraw stating she has conducted a review of the record and determined that Father's appeal is frivolous. ***See*** Application to Withdraw as Counsel, 11/17/22, at 1 (unpaginated). Attached to her brief is a copy of a letter Counsel sent to Father, which properly addressed and explained his rights pursuant to ***Millisock***.

Likewise, Counsel has filed an ***Anders*** brief that substantially complies with the requirements in ***Santiago***. While Counsel provided a summary of the procedural and factual history, made citations to the record where appropriate, and concluded the present appeal is frivolous, the ***Anders*** brief is sparse in its presentation of controlling law and the application of that law. Nevertheless, ***Anders*** and ***Santiago*** require substantial, not perfect compliance. ***Commonwealth v. Wrecks***, 934 A.2d 1287, 1290 (Pa. Super. 2007). As we find the applicable law regarding termination to be straightforward and referenced in part by Counsel's discussion, we conclude that her brief substantially complies with ***Anders*** and ***Santiago***. ***See Wrecks***, 934 A.2d at 1290 (stating that "[w]hile the brief fails to cite the law relevant to the question of timeliness, we find the applicable time limits to be straightforward[,]" thus substantially complying with ***Anders***). We therefore proceed with our independent review of the record and the issues presented on Father's behalf. ***See In re X.J.***, 105 A.3d at 4.

Counsel's ***Anders*** brief raises the following issues:

I. Whether the [orphans'] court erred in terminating the [parental rights of [Father] when the evidence was insufficient to justify termination under 23 Pa.C.S. § 2511.

- 11 -

II. Whether the [orphans'] court erred in terminating the parental rights of [Father] when the termination of his parental rights improperly rested on his extremely limited income.

*Anders* Brief at 7.[6]

The *Anders* Brief presents similar arguments in each of Father's potential claims. As such, we address them together. Father avers the Agency did not present clear and convincing evidence that termination "was in the best interest of Child" or that he "willfully refused his parental duties." *Anders* Brief at 13, 15. He insists, instead, that the court terminated his rights "on the basis that he has extremely limited income." *Id.* at 16. Father notes that he advised Outreach employees that his financial limitations made it difficult for him to attend visitation. *Id.* at 15. Father explained that he often did not attend because he "wrecked" his car and "it was costing him a lot of money for" transportation services to the visitation center. *Id.* at 16. Further, Father maintains that the Agency's evidence failed to show that the bond between Father and Child was broken, contending that Child "want[ing] to go [to his foster] home" during visitation sessions did "not clear[ly]" support that their bond was severed. *Id.* at 15.

Counsel also points out in the *Anders* brief that Father: (1) "was homeless and his employment was inconsistent[;]" (2) had an "overdose" prior to the termination hearing; and (3) "had not made any progress towards

---

[6] In the statement of questions involved, Counsel also included an inquiry as to whether her petition to withdraw should be granted. *Anders* Brief at 7. We address this issue separately.

alleviating the circumstances" that lead to Child's placement. ***Anders*** Brief at 16.

Our standard of review in termination of parental rights cases requires us to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). The court "is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted). We defer to the court because it often has "first-hand observations of the parties spanning multiple hearings." ***In re T.S.M.***, 71 A.3d at 267 (citations and quotation marks omitted). If the record supports the court's findings, we must determine whether the court committed an error of law or abused its discretion. ***Id.*** An abuse of discretion does not occur "merely because the record could support a different result." ***In re Adoption of L.A.K.***, 265 A.3d 580, 587 (Pa. 2021) (citation omitted). An abuse of discretion will only be found upon "demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** (citation omitted).

Involuntary termination of parental rights is governed by Pennsylvania's Adoption Act. ***See*** 23 Pa.C.S. §§ 2101-2938. Termination under the Act requires the court to conduct a bifurcated analysis in which the court focuses on parental conduct pursuant to Section 2511(a) and the needs and welfare of the child pursuant to Section 2511(b). ***In re L.M.***, 923 A.2d 505, 511 (Pa.

Super. 2007).  If the court finds that the movant has established grounds to terminate parental rights under Section 2511(a), the court must then analyze the evidence under Section 2511(b).  *Id.*  "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond."  *Id.*  The movant is burdened to show "clear and convincing" grounds for termination under both Sections 2511(a) and (b).  *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b).  As we need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), we will analyze the termination decree pursuant to Sections 2511(a)(1) and (b).  *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  Those sections provide as follows:

> **(a) General Rule**. — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \* \* \*
>
> **(b) Other considerations**. — The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to [S]ubsection (a)(1), . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

With respect to Section 2511(a)(1), this Court previously explained:

To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. **Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties**.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted & emphasis added). This Court has also instructed: "[I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the . . . court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but

- 15 -

instead consider the individual circumstances of each case." ***In re D.J.S.***, 737 A.2d 283, 286 (Pa. Super. 1999) (citations omitted). This requires the court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." ***In re B., N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted).

Further, we have stated:

> [T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

***In re Z.P.***, 994 A.2d 1108, 1119 (Pa. Super. 2010) (citation omitted).

Regarding the definition of "parental duties," this Court has emphasized the following:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d at 855 (internal citations & some punctuation

omitted).

Here, in concluding the Agency presented clear and convincing evidence

of Subsection § 2511(a)(1), the orphans' court opined:

> [Agency Specialized Services Supervisor Wood] testified that Father has been on call-in status since March 3, 2021, meaning he must call . . . Agency between 8:00-8:30 a.m. on the day of his scheduled visit to indicate that he will be attending, and if he does not, . . . Child will not be transported to the visit. On March 24, 2021, Father was placed on check-in status, meaning that in addition to calling [o]n the morning of the visit, Father must arrive one hour before the scheduled visit or . . . Child would not be transported[.] **These extra conditions were put into place due to Father's excessive no-shows**, which would disappoint . . . Child and cause unnecessary disruptions to his schedule. At one point, . . . Agency requested that Father's visits be reduced to the statutory minimum due to his poor attendance. **With the exception of one review period, Father never attended more than 44% of his [scheduled] visits [with Child]**.
>
> Given the fact that Father had a very inconsistent visitation attendance, and he **failed to maintain frequent and regular contact** with the Agency, and **failed to take advantage of all the resources offered to him to help him** maintain a bond with

- 17 -

. . . Child, [the c]ourt is satisfied that he has demonstrated a settled purpose of relinquishing parental claim to . . . Child.

Additionally, grounds for termination under 23 Pa.C.S. 2511(a)(1) may also be proven where a parent fails to perform parental duties for a period in excess of six months prior to the filing of the Petition for Involuntary Termination of Parental Rights.

Orphans' Ct. Op. at 7-8 (paragraph break & emphases added).

Regarding Father's performance of parental duties, the orphans' court further stated that Child was placed in foster care "due to concerns about parenting, truancy[,] and inadequate supervision." Orphans' Ct. Op. at 9. Child's "greatest needs" included "food, shelter, clothing, education, medical care, and comfort." *Id.* Since Father failed to attend visitation regularly, he failed to perform these duties consistently, leaving Child to rely on his foster family "for all of his physical and emotional needs." *Id.* Lastly, the court recognized that despite Father being engaged in visits that he did attend, Father only spent a total of 36.3 hours with Child during the period between his January 13, 2021, emergency placement to the September 15, 2022, hearing. *Id.* Consequently, the court found that the Agency presented clear and convincing evidence that Father demonstrated "a settled purpose to relinquish parental claim to . . . Child and failed to perform his parental duties for at least six months prior to the filing of the termination." *Id.* We agree with the court and conclude it did not abuse its discretion in termination Father's rights.

The record supports the court's findings: in addition to not attending regular visits with Child or performing parental duties, Father consistently

failed to make reasonable advancements in his identified goals — parenting classes, budgeting, organization, "follow through[,]" and housing — and "willfully avoid[ed]" caseworkers when they attempted to help him make progress. *See* N.T. at 12-18 (showing Father: (1) was difficult to reach; (2) never made progress towards identified goals; (3) did not pursue parenting classes; and (4) did not respond to Caseworker Ryder, leading to Outreach closing services), 17-21 (demonstrating Father: (1) continued to be difficult to reach; (2) did not respond to Caseworker Barnes when she tried to confirm meetings, and in one instance "hung up the phone" when she asked to meet him; (3) made no progress towards his identified goals; and (4) requested to discontinue services with Outreach).

Father avers that termination was based solely on his limited financial situation, and then referenced the expense of transportation to the visitation sessions. However, it is apparent from the termination hearing testimony that even without his financial hardships, Father was uninterested in making progress on his identified parental goals, or even communicating with caseworkers in some instances. *See id.* Moreover, we reiterate that Father also did not attend the termination hearing, even though he received proper notice.

Thus, because the evidence establishes Father failed to perform parental duties and demonstrated a settled purpose to relinquish his claim to Child since placement, we conclude the orphans' court did not abuse its discretion in terminating his parental rights pursuant to Section 2511(a)(1). *See* 23

Pa.C.S. § 2511(a)(1); **B., N.M.**, 856 A.2d at 855 (explaining that a parent "must exercise reasonable firmness in resisting the obstacles" which limit his ability to maintain a parent/child relationship). As we discern no abuse of discretion, we do not disturb the court's findings. **See In re T.S.M.**, 71 A.3d at 267.

We next review whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under [S]ubsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.**], [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791. However, . . . [an] evaluation of a child's bonds is not always an easy task.

**In re T.S.M.**, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (citations omitted).

Moreover,

[w]hile a parent's emotional bond with his or her child is a major aspect of the [S]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

The orphans' court concluded the Agency presented clear and convincing evidence satisfying Subsection 2511(b). Specifically, it stated that despite Father being "very invested" when he did visit with Child, "a parent's own feelings of love and affection do not prevent termination[.]" Orphans' Ct. Op. at 15. Further, it opined that: (1) it "feels strongly" that any bond Father has with Child "deteriorated" due to Father's inconsistency; (2) Father only minimally used the numerous services offered to him by the Agency, designed to help with parenting skills and substance abuse issues; (3) testimony at the hearing demonstrated that Child has lived with Swartz for six months and over that time has bonded with her; and (4) under the care of Swartz, Child is loved, cared for, participating in counseling, attends school every day, and

has his medical needs taken care of. *Id.* The court also noted that Swartz is ready, willing, and able, to adopt Child and his permanency should not be delayed "until Father decides to take tangible steps towards establishing a bond and being a resource for" him. *Id.* at 16. Lastly, it determined that termination would not destroy an existing bond or cause trauma, and adoption was in the best interests of Child. *Id.* We agree with the court's conclusions.

Father has failed to demonstrate that the orphans' court abused its discretion in its determinations. Child is cared for physically, mentally, and emotionally with Swartz, who expressed that she was ready to adopt him. Father has not offered any evidence suggesting that returning Child to him would be in Child's best interests. He just baldly asserts that the evidence failed to show that his bond with Child was broken. *See Anders* Brief at 15. To the contrary, in addition to the evidence the court noted — Father's inconsistency in visitation — the Agency also presented the following: (1) Child expressed he did not want to go to visitations with Father; (2) Child asked to go home during visitations with Father; and (3) during phones calls with Father, Child "never wanted to talk" and said he was "done" speaking with him. *See* N.T. at 29, 39. Moreover, we note that the Agency scheduled a bonding evaluation after a scheduled visit with Child, and Father failed to attend the visit. *Id.* at 30. Thus, Father's own actions resulted in him missing an opportunity to demonstrate any semblance of a bond he may have had with Child. *Id.* The record supports the court's conclusions and Father has

shown no abuse of discretion on the part of the court.  **See** 23 Pa.C.S. § 2511(b); ***In re K.Z.S.***, 946 A.2d at 762-63; ***In re T.S.M.***, 71 A.3d at 267.

Accordingly, based on our review of the record, Counsel did not overlook any non-frivolous issues.  We conclude that the orphans' court properly terminated Father's parental rights under Sections 2511(a)(1) and (b), and Father is not entitled to any relief.  Therefore, we affirm the decree terminating Father's parental rights and grant Counsel's application to withdraw.

Decree affirmed.  Counsel's application to withdraw granted.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/03/2023